Kevin H. Marino
John A. Boyle
Erez J. Davy
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ  07928-1488
(973) 824-9300
*Attorneys for Plaintiff Jett Elad*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JETT ELAD,**<br><br>            **Plaintiff,**<br>    **vs.**<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**<br><br>          **Defendant.** | Civil Action No. _____<br><br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Plaintiff, Jett Elad ("Elad"), through his undersigned attorneys, by way of Verified Complaint against Defendant, National Collegiate Athletic Association (the "NCAA"), alleges:

**SUMMARY OF THE ACTION**

1.      This is an action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the NCAA's enforcement against Plaintiff, an athlete selected to join the Rutgers University ("Rutgers") football team, of an unlawful eligibility rule that would prevent him from competing for Rutgers in the 2025-26 season in violation of federal antitrust laws.

2.      The eligibility rule at issue is unlawful because it has substantial anticompetitive effects on two-year or junior colleges and universities that are excluded from NCAA membership. Under NCAA rules governing Division I colleges and universities, student-athletes are only allowed to compete in intercollegiate sports for four years within a period of five calendar years.

This five-year period includes time spent at a two-year or junior college. The effect of this rule (the "Five-Year Rule") is to discourage student-athletes from attending junior college to prepare for four-year college and to punish those who do so, even though junior colleges may provide such student-athletes with necessary academic and other opportunities. And just as the student-athletes are deprived of the junior-college experience that may so benefit them, the junior colleges are deprived of elite athletes, reducing their ability to compete with NCAA schools.

3.    The effect of the NCAA's anticompetitive conduct is evident as it relates to Elad, an elite athlete who attended a junior college for one semester to repair his academic standing and prepare him to play NCAA Division I football.

4.    Under the circumstances, Rutgers requested that the NCAA exercise its discretion to waive the Five-Year rule as it applies to Elad, but the NCAA has refused to do so. Unless enjoined, the effect of the NCAA's anti-competitive conduct will be to penalize Elad for having attended a junior college. It will also permanently deprive him of a once-in-a-lifetime name, image, and likeness ("NIL") contract worth approximately $500,000 and the opportunity to enhance his career and reputation by playing another year of Division I football. The NCAA's anti-competitive conduct, coupled with its unreasonable denial of Elad's meritorious request for a waiver, thus threatens him with immediate irreparable harm.

5.    Because the NCAA's violation of federal antitrust laws is so clear, Elad seeks to enjoin the NCAA from enforcing the Five-Year rule as it applies to him while he pursues his antitrust claim in this action. Elad seeks a temporary injunction now because Rutgers spring practice begins on March 25, 2025 and, absent immediate injunctive relief, he will be prevented from participating in that critical preparation for the 2025-26 season.

**THE PARTIES**

6.    Elad is a Canadian citizen who was selected by Rutgers to play as a member of its football team in the 2025-2026 season.

7.    The NCAA is an unincorporated association headquartered in Indianapolis, Indiana that serves as the governing body of college sports.  It is, therefore, a citizen of the State of Indiana.

**JURISDICTION AND VENUE**

8.    This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367(a).  The Court has federal-question jurisdiction over Elad's claim for violations of the Sherman Act (Count One).  The Court has diversity jurisdiction over Elad's claim for breach of contract (Count Two) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  The Court also has supplemental jurisdiction over Elad's breach-of-contract claim because it is so interrelated with his Sherman Act claim as to form part of the same case or controversy.

9.    This Court has personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in the District of New Jersey, including athletic competitions, ticket and merchandise sales, television agreements and other revenue-generating activities, and have directed many of the specific acts alleged in the Complaint to Plaintiff within this District.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A. The Relevant NCAA Eligibility Rules And Their Discriminatory, Anticompetitive Effects On Junior Colleges.

11.     The NCAA is a voluntary, self-governing association of approximately 1,100 four-year colleges and universities that administers athletic competition for student-athletes.

12.     As the NCAA acknowledged in *NCAA v. Alston*, 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for student-athlete services, such that its restraints can and do harm competition.  With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually."  *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

13.     Excluded from NCAA membership are two-year colleges ("Junior Colleges"), many of which are members of the National Junior College Athletic Association ("NJCAA"), an organization designed to promote, govern, and foster a competitive environment for two-year college athletics.[1]  The NJCAA has no affiliation with the NCAA.[2]

14.     The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines.  These rules include those that determine the eligibility of student-athletes to participate in intercollegiate athletics.

15.     As a general matter, Division I teams are the most popular and attract the most money and the most talented athletes.

---

[1] *See* https://www.njcaa.org/about/mission/Mission_statement.

[2] *See Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736, at *9 n.5 (M.D. Tenn. Dec. 18, 2024).

16.    Of relevance to this action are two eligibility rules codified in the Division I 2024-2025 Manual (the "Bylaws") that have the effect of discriminating against Junior Colleges by discouraging and penalizing student-athletes who attend them.

17.    The first is the Five-Year Rule.  This rule forbids a student-athlete from competing for a Division I school beyond the five-year period beginning when the student was first registered in a "collegiate institution."[3]  More specifically, the Bylaws provide, in pertinent part:

> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. . . .

> **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution . . . when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term.

18.    The second relevant rule of eligibility is the four-year limitation on intercollegiate competition (the "Intercollegiate Competition Rule").   Under this rule, a student-athlete is forbidden from engaging "in more than four seasons of intercollegiate competition in any one sport."  (Bylaws § 12.8.)  Although Junior Colleges are excluded from Division I, the Bylaws define "intercollegiate competition" to include competition at either "a two-year or a four-year collegiate institution."  (Bylaws § 12.02.6.)

---

[3] A "collegiate institution" is defined in Bylaws section 14.02.4 as an institution of higher education that, in relevant part, "[i]s accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree."  This definition includes Junior Colleges.

19.    Notwithstanding these limitations, the NCAA maintains the discretion to waive application of the Five-Year and Intercollegiate Competition Rules to enable student-athletes to compete for NCAA member institutions.

20.    The NCAA has provided blanket waivers of the Five-Year and Intercollegiate Competition Rules to institutions in light of certain events.  One such blanket waiver was granted to institutions due to the COVID-19 pandemic.  This waiver permitted institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.[4]

21.    The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

22.    In *Pavia*, the court granted Diego Pavia ("Pavia"), the quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that had Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

23.    The court found an injunction appropriate due to the clear anticompetitive effects the NCAA's interpretation of the Intercollegiate Competition Rule—*i.e.*, by counting Pavia's year of Junior College football as a season of competition—would have on Junior Colleges and student-athletes:

> First, the challenged rules limit the NCAA Division I eligibility of
> student-athletes who attended junior college to two or three seasons

---

[4] *See Pavia*, 2024 U.S. Dist. LEXIS 228736, at *10 n.6 (explaining that, due to the COVID pandemic, "[t]he NCAA issued a blanket waiver permitting institutions to self-apply a season of competition and a one-year eligibility waiver.").

while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.

The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.

NCAA Division I member institutions compete directly with NJCAA schools for football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.

In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

*Pavia*, 2024 U.S. Dist. LEXIS 228736, at *22-23 (cleaned up).

24.     The *Pavia* decision further found that the NCAA's interpretation of the Intercollegiate Competition Rule harmed consumers. In so ruling, the court reasoned that the "restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *24.

25.     Following the December 18, 2024 decision in *Pavia*, the NCAA provided a blanket waiver (the "*Pavia* Waiver") of the Intercollegiate Competition Rule to any student-athlete who (i) competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria.

26.     But for the NCAA's interpretation and application of the Five-Year Rule to Elad, he would qualify for the *Pavia* Waiver.

### B. Elad's Background And Collegiate Sporting Experience From 2019 Through The 2024-2025 Season.

27.     Elad is a talented and highly sought-after football player who plays the position of defensive back. The relevant details of his college football career are provided below.

28.     <u>2019-20 Season</u>. Elad enrolled at Ohio University for the 2019-2020 season and was selected to play on its football team. However, Elad was redshirted for that year. This meant that, while the year counted towards the Five-Year Rule, Elad did not use a season of competition for purposes of the Intercollegiate Competition Rule.

29.     <u>2020-2021 Season</u>. During the 2020-21 season, Elad engaged in limited competition on behalf of Ohio University due to the COVID-19 pandemic. Ohio University's football team competed in just three games during the 2020-2021 season because of the COVID-19 pandemic and Elad again redshirted for that season. Due to the blanket waiver granted by the NCAA for the pandemic, that season did not count towards either the Intercollegiate Competition or Five-Year Rule.

30.     <u>2021-22 Season</u>. Although Elad played nine games for Ohio University during the 2021-22 season and thus used his first season of competition for purposes of the NCAA's eligibility rules, his time at the institution was limited and marred by personal challenges. More specifically, at the start of the 2021 season, Ohio University's head football coach retired,

triggering staffing changes that did not align with Elad's personal and professional goals. While Elad remained with the team throughout the season, he saw limited opportunities for growth and development. He also sustained a foot injury that he felt was inadequately managed. During this difficult period, Elad felt that his concerns were not being addressed by Ohio University staff. Thus, in the fall of 2021, he made the difficult decision to switch schools to seek a program that would provide him with the training, development, and medical support necessary for his success. But as a result of inadequate academic counseling, he withdrew from all courses at Ohio University without fully understanding the consequences of that decision.

31.     <u>2022-23 Season</u>. As a result of the challenges and ill-informed decisions he made at Ohio University, Elad's cumulative GPA and progress towards degree were detrimentally impacted and he had no choice but to enroll at a Junior College in order to regain his academic standing. Elad thus enrolled in Garden City Community College for the fall 2022 semester and competed on its behalf in the 2022-23 NJCAA football season.

32.     <u>2023-24 Season</u>. Through the opportunity provided to him by Garden City Community College, Elad regained his good academic standing and NCAA eligibility. As a result, Elad transferred to the University of Nevada, Las Vegas ("UNLV"), where he played football for the UNLV Rebels during the 2023-24 season, thereby using another season of competition for purposes of the NCAA's eligibility rules.

33.     <u>2024-25 Season</u>. While at UNLV, Elad got his academic and athletic career back on track. He remained at this institution and played for the Rebels during the 2024-25 season, thereby using another season of competition for purposes of the NCAA's eligibility rules.

34.     To say that Elad excelled while at UNLV would be an understatement. His performance during both the 2023-24 and 2024-25 seasons earned him finalist recognition for the

Jon Cornish trophy, an award given to the top Canadian talent in the NCAA.  Elad also received Honorable Mention for the All-Mountain West Team, and his contribution to the Rebels during the 2024-25 season helped the UNLV Rebels reach the LA Bowl, where they defeated the California Golden Bears on December 18, 2024.

### C.  Elad's Decision To Join Rutgers, The NCAA's Denial Of Rutgers's Request For A Waiver, And The Need For Immediate Injunctive Relief.

35.    Following UNLV's victory at the LA Bowl, Elad learned of the *Pavia* decision and believed it would enable him to play another season of Division I football.

36.    Around the same time, Elad was informed that the UNLV coaching staff had joined a different university.

37.    In light of these developments, Elad entered the transfer portal[5] to play Division I football.  Within days of entering the transfer portal, he was offered and accepted an opportunity to enroll at Rutgers and play football for the Scarlet Knights in the Big Ten, one of college football's most prestigious and competitive conferences, which are collectively known as the "Power Four."   Elad believed this opportunity was ideal for him academically and personally, as it would enable him to continue his football career and be close to his mother, who worked just two hours away from the Rutgers campus.

38.    In conjunction with the opportunity to play at Rutgers, Elad was also offered and accepted an NIL (name, image, and likeness) contract worth approximately $500,000.  That NIL contract is a life-altering source of revenue for him and his family.

---

[5] The transfer portal is an online database that lists student-athletes who are interested in changing schools. *See*    https://www.espn.com/college-football/story/_/id/42394369/what-college-football-transfer-portal-works-dates-explained.

39.    Shortly after extending this opportunity to Elad, Rutgers asked the NCAA to waive enforcement of the Five-Year Rule, which would automatically entitle Elad to eligibility for the 2025-26 season.

40.    On February 28, 2025, the NCAA informed Rutgers that its waiver request was denied.

41.    On March 19, 2025, Rutgers appealed the NCAA's February 28th decision internally within that organization.  That appeal is pending.

42.    Given the NCAA's refusal to grant Elad a waiver for the 2025-26 season, Elad has filed this action to obtain injunctive relief from this Court.  The need for such relief is urgent.

43.    Rutgers begins spring practice for the 2025-26 football season on March 25, 2025. These spring practices are critical to both the team and Elad, as they would facilitate his integration into the team's overall strategy and defensive play and enable Elad to develop a rapport with the Rutgers coaching staff and teammates.  It is Elad's understanding that if the NCAA does not grant him a waiver or he is not otherwise deemed eligible by the start of spring practice, Rutgers will be forced to replace him on the roster with another player and he will lose his opportunity to play for Rutgers next season.

**D.  Relevant Markets**

44.    As the court in *Pavia* found, the relevant market for purposes of this case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *20.

45.    The United States is the relevant geographic market, and the NCAA and its member institutions are located in that geographic market.

46.    College athletes compete to earn spots on NCAA Division I athletic teams and NCAA member institutions compete with other institutions to attract and secure top-level college

athletes.  NCAA member institutions secure college-athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programing, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staffs.

47.    Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide millions of dollars in financial benefits; and (7) receipt of top-tier academic support through student-athlete assistance programs.

48.    The most talented student-athletes have no practical alternatives in the relevant markets to participating in NCAA Division I athletics.

49.    The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

50.    Though the NCAA is a non-profit organization, its member institutions reap significant financial gains through the transactions they make with student-athletes.  Member institutions reap revenue through hosting athletic events on their campuses, merchandise sales, television broadcasting contracts, and the generation of interest in their institutions.  In return, the student-athletes receive the many benefits enumerated above.

51.    Accordingly, the transactions between member institutions and student-athletes are inherently commercial in nature and fall within the purview of the Sherman Act.

### E. Anti-competitive Effects

52.     The NCAA enacts and enforces rules that it claims promote fairness and the well-being of student-athletes while preserving true athletic amateurism.  These rules are adopted through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions who compete against one another for the labor of student-athletes.

53.     The NCAA's refusal to grant Elad the requested waivers, beyond being contrary to law, is wholly unfair to him, his teammates, and Rutgers.  The NCAA's conduct violates the Sherman Act because it has direct anticompetitive effects that harm junior colleges, college athletes, and consumers of college athletics.

54.     Allowing the NCAA to apply the Five-Year Rule to encompass time spent at Junior Colleges would cause significant anticompetitive harm to Junior Colleges, Elad, and similarly situated student-athletes participating in the labor market.  More specifically, as the court in *Pavia* found, enforcing NCAA rules that discourage or penalize student-athletes from attending Junior Colleges harm the Junior Colleges' ability to compete with Division I schools for talented athletes and limit the choice of educational institutions available to student-athletes.

55.     Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct.  It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so.  The most talented prospective student-athletes may be deterred from attending Division I schools if they believe the NCAA does not promote fair competition and does not treat athletes fairly, especially with the growing availability of other professional sports opportunities in the United States and elsewhere.  Moreover, as the court found in *Pavia*, consumers of Division I intercollegiate events

will be harmed because the level of competitiveness of Division I teams will be reduced due to the restrictions placed on elite athletes who attend Junior Colleges.

### F. The NCAA's Rule Of Restitution.

56.    Section 12.11.4.2 of the NCAA Bylaws—commonly known as the "Rule of Restitution"—provides as follows:

> **12.11.4.2 Restitution**.  If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but *in accordance with the terms of a court restraining order or injunction* operative against the institution attended by such student-athlete or against the Association, or both, and *said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified*, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:
>
> (a)    Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
>
> (b)    Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
>
> (c)    Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;
>
> (d)    Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
>
> (e)    Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
>
> (f)    Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;
>
> (g)    Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in

the seasons in which such ineligible student-athlete participated;

(h)    Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i)    Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

57.    The Rule of Restitution allows the NCAA to punish a student-athlete and the member school he or she attends (as well as the student-athlete's teammates) if the student-athlete and the school rely on a court-issued temporary restraining order ("TRO") or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the student-athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason.

58.    The clear purpose and effect of the Rule of Restitution is to discourage challenges to the NCAA's anticompetitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief.  Indeed, in light of the Rule of Restitution, colleges and universities typically do not permit a student-athlete to participate in athletic competition even if he or she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

59.    As a result, courts, including this one, have enjoined the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *See Williams v. NCAA*, No. 24-cv-614, 2024 U.S. Dist. LEXIS 18479, at *9 (D.N.J. Feb. 2, 2024); *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *36; *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601-02 (N.D.W.V. 2023).

60.    For the preliminary injunctive relief requested by Elad to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

## G.  The Irreparable Harm To Elad

61.    Elad will suffer substantial irreparable harm if the Court does not grant the preliminary injunction with temporary restraints requested in this action, which would enable him to immediately join his Rutgers teammates for spring training commencing on March 25, 2025, and continue his promising football career by competing for the Scarlet Knights in the 2025-26 season.

62.    By contrast, if the Court does not grant Elad the requested injunctive relief, he will be unable to play for Rutgers in its 2025-26 season.  He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team in one of college football's most prestigious and widely covered conferences, to take advantage of the NIL deal he has now signed, and to increase his chances of earning a contract to play professional football following the 2025-26 season.  Missing out on these opportunities is the very definition of irreparable harm, as this Court recently recognized in *Williams v. NCAA*, 2024 U.S. Dist. LEXIS 18479, at *7-8 (D.N.J. Feb. 2, 2024).

63.     Unless he is assured that he will be eligible to play during the 2025-26 season, Elad will also lose the opportunity to practice with the Scarlet Knights beginning March 25, 2025. These missed practices also would harm Elad irreparably, as it would deprive him of critical and irreplaceable opportunities to become integrated into the Knights' defense and the team as a whole. Further, if Elad is not declared eligible to play in the 2025-26 season by the start of spring practice on March 25, 2025, Rutgers will sign another player at his position (defensive back) through the transfer portal to fill his roster; in that event, Elad will lose the opportunity to play Division I college football this coming season regardless of how his eligibility status is ultimately resolved.

64.     Despite the obvious and immediate harm that Elad would suffer if not granted the requested waivers, the NCAA has refused to grant him a waiver of the Five-Year Rule (and thus also refused to grant him the *Pavia* Waiver, which is dependent on the waiver of the Five-Year Rule). The NCAA has done so—confusingly and inconsistently—even though it granted the *Pavia* Waiver on a blanket basis for purposes of the Intercollegiate Competition Rule. This Court's immediate intervention is needed to right this wrong.

## COUNT ONE
### (Violation of § 1 of the Sherman Act)

65.     Elad repeats and realleges the allegations contained in Paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     The NCAA, by and through its officers, directors, employees, agents or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to waive the Five-Year Rule as it applies to Elad's semester attending a Junior College. The threat posed by the NCAA having license to bar student-athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

67.     As a direct result of the NCAA's denial of Elad's waiver request, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

68.     The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests.  Indeed, the NCAA's position is logically inconsistent with its own decision to grant student-athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

69.     The NCAA's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

**COUNT TWO**
**(Breach of Contract)**

70.     Elad repeats and realleges the allegations contained in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.     Rutgers is a member of the NCAA Division I.  As such, Rutgers has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions.  Furthermore, Rutgers has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

72.     Elad, as a student-athlete enrolled at Rutgers who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between Rutgers and the NCAA.

73.     The NCAA has a contractual obligation to Elad, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently and reasonably.

74.     As detailed above, the NCAA refuses to deem Elad eligible for the 2025-26 Division I college football season based on its unreasonable and arbitrary application of the Five-Year Rule and its rule counting junior college competition as intercollegiate competition, even though the recent ruling in *Pavia* makes clear that this application violates the Sherman Act and is thus unlawful and invalid.

75.     The NCAA is treating the Five-Year Rule, when coupled with the rule counting junior college competition as intercollegiate competition, as valid and enforceable but the *Pavia* ruling makes clear that it is not.  As a result, the NCAA's insistence that the season Elad spent playing football at a junior college counts as intercollegiate competition for purposes of the Five-Year Rule is directly contrary to its promise to enforce and adjudicate its rules fairly.

76.     By refusing to deem Elad eligible for the 2025-26 Division I college football season based on the Five-Year Rule, the NCAA has breached its contractual obligations to him because there is no NCAA rule or regulation in existence that authorizes or permits those actions.

77.     As an intended third-party beneficiary of Rutgers's agreement to be bound by the NCAA rules and regulations, Elad has suffered and continues to suffer substantial and irreparable harm as a result the NCAA's denial of his eligibility to participate in athletics without any valid contractual authority.  To unjustly prevent Elad from playing football during the 2025-26 season deprives him of the once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his teammates, and showcase his talents to future professional employers.  Specifically, Plaintiff will be unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

## COUNT THREE
### (Breach of the Implied Covenant of
### Good Faith and Fair Dealing)

78.     Elad repeats and realleges the allegations contained in Paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79.     There is a covenant of good faith and fair dealing implied in every contract, including the contract between the NCAA and Rutgers to which Elad is an intended third-party beneficiary.  That covenant imposes on the parties an obligation to treat one another reasonably and fairly, and to not do anything to destroy or injure one another's right to receive the fruits of the contract.

80.     As detailed above, the NCAA has treated Elad unreasonably and unfairly, and has destroyed and injured his contractual rights, by counting the season Elad spent playing football at a junior college as intercollegiate competition for purposes of the Five- Year Rule and thereby deeming him ineligible to play in the 2025-2026 season.  The NCAA has engaged in this conduct for the improper purpose and ill motive of enforcing its application of the Five-Year Rule, which the *Pavia* decision makes clear is a violation of the Sherman Act.

81.     The NCAA has, therefore, breached the implied covenant of good faith and fair dealing.

82.     As a direct and proximate result of the NCAA's breach of the implied covenant of good faith and fair dealing, Elad has suffered and will continue to suffer significant damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Elad respectfully requests Judgment in his favor and against the NCAA as follows:

A.    Declaring that (i) the NCAA's application of the Five-Year Rule to include time spent at Junior Colleges violates the Sherman Act; and (ii) Elad is eligible to play for Rutgers during the 2025-26 season;

B.    Preliminarily and permanently enjoining the NCAA to immediately grant Elad's waiver request to enable him to compete for Rutgers during the 2025-26 season;

C.    Preliminarily and permanently enjoining the NCAA from enforcing the Five-Year Rule to include time spent at Junior Colleges;

D.    Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Elad and any institution, including Rutgers, for which Elad plays intercollegiate athletics for complying with and/or relying on any injunctive order entered by this Court; and

E.    Awarding Elad compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

Dated: March 20, 2025        MARINO, TORTORELLA & BOYLE, P.C.
       Chatham, New Jersey

By: _____
     Kevin H. Marino
     John A. Boyle
     Erez J. Davy
     437 Southern Boulevard
     Chatham, New Jersey 07928-1488
     (973) 824-9300
     *Attorneys for Plaintiff Jett Elad*

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Jett Elad, hereby

demands a trial by jury on all issues properly so triable.

Dated: March 20, 2025                          MARINO, TORTORELLA & BOYLE, P.C.
         Chatham, New Jersey

                                              By: _____
                                                  Kevin H. Marino
                                                  John A. Boyle
                                                  Erez J. Davy
                                                  437 Southern Boulevard
                                                  Chatham, New Jersey 07928-1488
                                                  (973) 824-9300
                                                  *Attorneys for Plaintiff Jett Elad*

## **VERIFICATION**

I, Jett Elad, verify based on my personal knowledge that the facts set forth in the attached Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on March 20, 2025

_____
JETT ELAD